UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DERRICK LOUIS CARTER, | CASE NO. C20-1654 MJP |
| Petitioner, | ORDER DENYING MOTION UNDER 28 U.S.C. § 2255 |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

This matter comes before the Court on Petitioner Derrick Louis Carter's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct his sentence. (Dkt. No. 1.) Having reviewed the Motion, Respondent's Opposition (Dkt. No. 9), and all supporting materials, the Court DENIES the Motion and DISMISSES the Petition.

**BACKGROUND**

Carter's § 2255 Petition stems from his criminal case, USA v. Brown, et al., Case No. CR15-211-MJP-2 (W.D. Wash. 2016). Following a jury trial, Carter and his codefendant and brother, John Emmett Brown, Jr., were convicted of Conspiracy to Distribute Cocaine (5

kilograms or more) and Possession of Cocaine (5 kilograms or more) with Intent to Distribute. Carter was sentenced to two concurrent 120-month prison terms, the mandatory-minimum sentence for each count.

Carter asks the Court to vacate his sentence for three reasons. First, Carter asserts that he received ineffective assistance of trial counsel. (Dkt. No. 1 at 5.) He claims that his "trial attorney failed to present exculpatory evidence which could have supported defense testimony and discredit Agent Penn's statements." (Id.) Carter also asserts that his trial attorney failed to present testimony of two witnesses on the issue of his duress defense: (1) Kristina Johnson, and (2) Agent/Officer Teaken. (Id. at 7.) Second, Carter claims he received ineffective assistance of appellate counsel. He asserts that his attorney on appeal failed to present exculpatory evidence in the "first appeals brief as requested" and "[t]hen tried to cover the issue in the final brief, and was denied because it was not in first brief." (Id.) Third, Carter argues that the prosecutors engaged in misconduct regarding certain purportedly exculpatory evidence. (Id. at 8.)

Carter asks that he be appointed an attorney and/or that he be allowed to join in his brother's § 2255 habeas petition, and that the Court vacate his sentence. The Court notes that Carter cannot join Brown's habeas petition. See Rule 2(d), Rules Governing Section 2255 Proceedings. Even if he could, the Court has already denied Brown's habeas petition. See Brown v. USA, C20-929 MJP, Order Denying Habeas Petition, Dkt. No. 17 (W.D. Wash. Jan. 8, 2021).

**A.     Factual Background**

1.   2011

While Carter's criminal conviction stems from events in 2014, Carter's habeas arguments relate to a debt Brown incurred three years earlier. In 2011, Brown offered to provide law enforcement with his "knowledge of the United Nations Gang" (the U.N. Gang), a Canadian

gang then involved in large-scale drug smuggling. RT_680-81, 784, 800-01, 1530-31, 1571-73. According to Brown, a Canadian company called American Fabricators (AmFab) was functioning as a front for the Gang. RT_1532-33, 1572, 1580-81.

Brown told Federal Agents that Curtis Coleman, a member of a different gang, the Seattle-based "Deuce 8" sold firearms to the U.N. Gang. RT_1709-13, 1272-30, 1753-54, 1757, 2074-76, 2152-56, 1727-28. The information was passed along to Homeland Security Investigations Special Agent Thomas Penn who began investigating Coleman with Brown acting as a source of information. RT_2067-69, 2102-02, 2130, 2145-48. When Coleman was arrested on a weapons charge, AmFab was unable to collect the money it had fronted Coleman to smuggle 25 pounds of marijuana into the United States. RT_1735-36. Word got back to AmFab that Brown's "daughter's mother"—Colleen Cruz—caused the police action, and Coleman "was telling them that [Brown] set them up." RT_1743-44.

While in custody that summer for an immigration violation, Brown was told that he owed AmFab money because he was being held responsible for the lost $60,000 from the summer before. RT_1739-41; RT_1741-43. Brown said he was also told that if he did not settle that debt, "it's going to be on my daughter's mom," namely Cruz, and "my daughter." RT_1745-46, 1751. Knowing that people involved with AmFab "have no problem killing people," Brown said he agreed to pay that debt or "work it off." RT_1743-47.

Meanwhile, Coleman wrote his mother a letter which led prison authorities to believe Brown had been identified as an informant. RT_2102-03. On July 27, 2011, Penn received an email from the prosecutor that included a copy of Coleman's letter, along with the note, "[L]ooks like he's warning his brother, question mark, about Brown." RT_2104-05, 2134, 2144. Penn later testified that he did not view that letter as a "clear threat" against Brown; in Penn's view, Brown

was just "telling his mom to tell all his brothers to stay away from John Brown," because he was "[i]nforming to the government." RT_2105-06, 2146.

Nevertheless, in August 2011, Brown was told by federal agents that they had "credible information" that Brown's "life had been threatened" by Coleman. RT_1748, 1987, 2051-52, 149-50. Following this disclosure, Brown said he then told the agents "everything I knew about American Fabricators," and provided the names of several AmFab members. RT_1702, 1752, 2062-63. In March 2012 Coleman was sentenced to a 60-month prison term for being a felon in possession of a firearm. CR_255 at 1-2.

2. <u>2014</u>

Three years later, in October 2014, Brown was in Bellingham, Washington when he heard a member of AmFab visited Cruz's home, looking for Brown. RT_1627, 1629-30, 1633-34, 1636, 1761-62, 1924. Brown called AmFab and was chastised for not repaying his debt and was told to host an AmFab member's cousin while he visited Washington. RT_1763-64. When the cousin complained about how Brown treated him, AmFab members visited Cruz's house again. RT_1773, 1789. Brown contends members of AmFab visited Cruz's house looking for him on several more occasions and one member specifically threated that if Brown did not start working off his debt, AmFab would "go to my daughter's house, and get my daughter's mom to pay it, and get my daughter to work it off." RT_1773, 1789, 1805.

Brown testified that because he "owed the organization," and had "to do what they say, so that they stay out of my daughter's yard," Brown agreed to go to California to pick up drugs. RT_1790 1794, 1799, 1880, 2072. After the drugs were loaded, Brown said a man approached him, gave him a phone, and told him to call his daughter. RT_1828. Brown complied, and when

he called Cruz told him a man was in her yard. RT_1828-29. Brown said gang members "wanted to try and sit on my daughter until . . . the rest of the deal was done." RT_1838.

On November 8, 2014, Brown received a call from a member of AmFab who told him he knew where his daughters were, and asked which one "do you want to lose?" RT_1844-45, 1849. After that call Cruz and Brown's daughter came to Bellingham and had dinner at a restaurant with Brown. RT_1928-30. Following the dinner, Brown told Cruz and his daughter to "go home. Y'all will be safe." RT_1844-45, 1849. Brown asked Carter for help smuggling the drugs, and Carter agreed because, as Brown testified, "he knew that my daughters' lives had been threatened." RC 1845, 1894-95, 1898-91. Brown, Carter, and others then packed up the cocaine from California in three backpacks and crossed the border. RT_1849, 1854-55, 1858, 1936, 1972-74, 1899. Once back in the United States, Brown noticed police activity on the other side of the border. RT_1862. Brown said he could not reach Carter, so he walked to a nearby friend's house and stayed the night. RT_1862. Brown later learned Carter had been stopped by the police. RT_1978-79.

Brown said the U.N. Gang/AmFab wanted to kill Carter, who they blamed for the loss of the cocaine. RT_1868-69. Brown said AmFab also began threatening his friends in an effort to find him, and told Brown that if he did not come see them in Canada they would hurt his daughter. RT_1863-64, 1867, 1870. On December 5, 2014, Brown accompanied Kristina Johnson, one of his friends who had been threatened, to the Whatcom County Courthouse. RT_1864-65. Brown spoke with a deputy he knew "about the problem we had," and they were then joined by another deputy. RT_1865-66. Brown showed the deputies Johnson's phone, which Brown said displayed two phone numbers from which Johnson had received threatening calls from "cartel members." RT_1866-67. Brown also said he told the deputies that "these

people were threatening my daughters." RT_1866. Brown said he was hoping the deputies could trace those numbers and "lock them up." RT_1867.

Brown and Carter were eventually arrested in June 2015. RT_1512-13, 1592-93.

**B.     Procedural History**

    1.  <u>Discovery (Coleman Calls)</u>

In October 2015, Brown's initial defense counsel told a prosecutor that, according to Brown, during an August 8, 2011 interview Brown was told by Agent Penn and another officer "that the Justice Department has credible information that his life was under threat" by Curtis Coleman, and that "there are phone calls that contain the threats." CR_255 at 2; CR_263 at 3; CR(2255)_1-3 at 1-2. Agent Penn's report of that interview—disclosed in July 2015—made no mention of any such advisement. CR_229 at 4; CR_229-4 at 1-4; CR_255-10 at 3. On June 10, 2016, Coleman's jail calls (totaling 85 calls, about 21 hours' worth), along with some other discovery were made available to the defense after several requests, and a motion to compel brought by Carter and Brown. CR_255 at 5; CR_255-10 at 2, 9; CR_255-11 at 7.

    2.  <u>Trial</u>

Brown and Carter proceeded to trial on June 27, 2016. Carter's defense was that he was forced to participate in the November 2014 smuggling operation because the U.N. Gang/AmFab was threatening Cruz and Brown's daughter. Neither Carter nor Brown introduced into evidence any of Coleman's jail calls. As requested (and over the government's objection [RT_2249]), the Court instructed the jury on defendants' duress defense, explaining:

> A defendant acts under duress only if at the time of the crime charged, one, there was a present, immediate, or impending threat of death or serious bodily injury to the defendant or a family member of the defendant if the defendant did not participate in the commission of the crime; two, the defendant had a well-grounded fear that the threat of death or serious bodily injury would be carried out; and three, the defendant had no reasonable opportunity to escape the threatened harm.

RT_2278-79. On July 25, 2016, the jury returned its verdict. CR_188. The jury convicted Brown and Carter on the conspiracy and possession with intent charges in Counts 1 and 2. CR_192.

### 3. Motion for a New Trial

On August 29, 2016 Brown and Carter filed a motion for a new trial. CR_210, 212. In part, they argued that the Government violated <u>Brady</u> by not timely producing a recording of Brown's transport following his arrest and a report prepared by an agent memorializing his 2011 interview with Brown. CR_212 at 8-9. But in their reply brief, Carter and Brown argued that the late disclosure of the 2011 Coleman calls violated <u>Brady</u>. CR_249 at 2-3. Following a hearing on December 5, 2016, the Court denied the motion for a new trial. Because "counsel for Defendants were made directly and specifically aware of the existence of the very phone call they were looking for nearly two weeks before trial (and nearly six weeks before the opening of the defense case)," the court found "that the evidence at issue was [not] 'suppressed' by the prosecution." CR_273 at 13-14.

### 4. Appeal

On appeal Carter argued that the prosecution committed several <u>Brady</u> violations by suppressing a 2011 email exchange between the Coleman prosecutor and Agent Penn and delaying production of the Coleman jail calls. Carter also argued that the government knowingly allowed Agent Penn, who was called as a defense witness, to testify falsely about his knowledge of the May 18th call prior to the August 8, 2011 interview with Brown. Finally, Carter argued that that the prosecutor committed misconduct in summation by vouching for the government's witnesses, denigrating the defense, and misstating the legal standard regarding his duress defense.

The Ninth Circuit affirmed Brown's and Carter's convictions. United States v. Brown and Carter, 754 F. App'x 581 (9th Cir. 2019). Regarding the Brady claim, the Ninth Circuit ruled:

> Here, Brown and Carter fail to show prejudice because they have not demonstrated that the recorded telephone call and the email are relevant to their duress defense. Brown and Carter argued that they only agreed to smuggle cocaine into Canada because the U.N. Gang was threatening Brown's family. But the Coleman telephone call and forwarded email showed Coleman was upset with Brown for unrelated reasons. The record does not show that Coleman was part of the U.N. Gang. And Brown and Carter's decision to smuggle cocaine for the U.N. Gang would have done nothing to allay Coleman's ire toward Brown. Accordingly, Brown and Carter have failed to show that there is any "reasonable probability" that the jury would have acted differently had they learned of the Coleman materials at trial. Strickler, 527 U.S. at 281.

754 F. App'x at 582.

## ANALYSIS

### A. Appointment of Counsel

Carter's Petition asks for appointment of counsel. Based on the Court's review of the petition and the Order denying Brown's habeas petition, the Court finds that the interests of justice do not require or compel appointment of counsel. The Court DENIES the request.

### B. Timeliness of Petition

28 U.S.C. § 2255(f)(1) requires Carter to have filed his petition within one year of his conviction becoming final. Carter's conviction became final on October 7, 2019, when the Supreme Court denied his certiorari petition. See 140 S. Ct. 303 (2019). He filed this petition on November 6, 2020, roughly one month after the deadline. Recognizing this fact, Carter identifies a variety of issues he claims impacted his ability to file his petition on time:

> My facility went on lockdown for the Covid pandemic. I had no access to any law library or legal advice. I am also completely ignorant of legal procedures. I am having difficulty with this form even, and beg that the court appoint an attorney to help me through this process.

(Dkt. No. 1 at 13.)

Although Carter's petition is untimely, the Court may accept it under the doctrine of equitable tolling, which applies to § 2255 petitions. United States v. Battles, 362 F.3d 1195, 1196 (9th Cir. 2004). To obtain equitable tolling, Carter must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Holland v. Florida, 560 U.S. 631, 649 (2010) (citation and quotation marks omitted). "Equitable tolling is available 'only when extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time and the extraordinary circumstances were the cause of [the prisoner's] untimeliness.'" United States v. Gilbert, 807 F.3d 1197, 1202 (9th Cir. 2015) (quoting Bills v. Clark, 628 F.3d 1092, 1097 (9th Cir. 2010) (emphasis in the original)). "This is a very high threshold." Gilbert, 807 F.3d at 1202.

Under the unique facts presented, the Court finds that equitable tolling excuses Carter's tardy petition. The Court finds that extraordinary circumstances—the COVID-19 pandemic—stood in Carter's way from filing this petition a month earlier. Acting pro se, Carter avers that he has been without access to a law library due to the pandemic-related lockdown, and he asserts that this impeded his ability to file this in a timely manner. (Dkt. No. 1 at 13.) The government agrees that Carter would be entitled to equitable tolling "[i]f Carter could show that a COVID-related lockdown actually prevented him from filing his §2255 motion on time." (Dkt. No. 9 at 4-5 (citing Sossa v. Diaz, 729 F.3d 1225, 1236 (9th Cir. 2013).) The government believes there is insufficient evidence to this effect. The Court disagrees. While Carter has not provided great detail about how the COVID-19 pandemic impacted his filing efforts, the Court accepts his averment that the pandemic has frustrated his access the law library and that this prevented his

filing a month earlier. And the Court is satisfied that Carter was otherwise diligent in pursuing this matter. The Court thus applies equitable tolling and accepts this month-late-filed petition.

**C.     Custody Requirement**

While Carter is no longer in prison, he is still in "custody" because he is on supervised release. See Matus-Leva v. United States, 287 F.3d 758, 761 (9th Cir. 2002); United States v. Brown, CR15-211 MJP-2, Dkt. No. 358 (granting Carter's motion for compassionate release, resentencing him to time served, and ordering him subject to supervised release). This satisfies the "custody" requirement of § 2255.

**D.     Section 2255 Legal Standard**

Carter brings his habeas petition under 28 U.S.C. § 2255. Under section 2255 a court may grant relief to a federal prisoner who challenges the imposition or length of his or her incarceration on grounds that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). A movant must allege specific facts that, if true, entitle the movant to relief. See United States v. Howard, 381 F.3d 873, 877 (9th Cir. 2004). A judge may dismiss a § 2255 motion if "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." Rule 4(b), Section 2255 Rules.

**E.     Ineffective Assistance of Counsel**

Carter argues he received ineffective assistance of counsel because his trial attorney failed to: (1) introduce exculpatory evidence that could have supported defense testimony and discredit Agent Penn's statements, which the Court interprets to refer to recorded calls from

Curtis Coleman; (2) call Kristina Johnson as a witness; or (3) call Officer/Agent Teaken as a witness. Carter also argues that the attorney representing him on his direct appeal was ineffective because he failed to reference more than one of the Coleman calls in the opening brief, despite Carter asking him to do so.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 685 (1984). Such a claim must prove two independent components: (1) inadequate performance by counsel, and (2) prejudice resulting from the inadequate performance." Id. at 690. To prevail on the second point, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

**1.     Coleman Calls**

The Ninth Circuit has already determined that Carter cannot demonstrate that "the recorded telephone call and the email are relevant to [his] duress defense." Brown, 754 F. App'x at 582. "The record does not show that Coleman was part of the U.N. Gang. And Brown and Carter's decision to smuggle cocaine for the U.N. Gang would have done nothing to allay Coleman's ire toward Brown." Id. "Accordingly, Brown and Carter have failed to show that there is any 'reasonable probability' that the jury would have acted differently had they learned of the Coleman materials at trial." Id. (quoting Strickler v. Greene, 527 U.S. 263, 281 (1999)).

**2.     Johnson**

Carter asserts that his trial counsel, Michael Nance, was ineffective for ignoring Carter's request that he call Kristina Johnson. (Dkt. No. 1 a 7.) The Court interprets this assertion to suggest that Kristina Johnson would have testified favorably about the duress defense. According

to Brown's trial testimony, Johnson was present when Coleman told Brown about purported threats against Cruz and Brown's daughter and Brown's disclosure of the threats to the Whatcom County deputies. RT_1838, 1847, 1865-66. 1891, 1896-97. But Johnson refused to be interviewed by the defense. RT_364; CR_71 at 10-11. Nance was thus unable to determine whether Johnson would recant her threat claim when asked about it under oath, or whether she would testify the threat occurred after the smuggle and thus was irrelevant to Carter's duress defense. The Court finds Nance's decision was within the range of professional judgment. Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial.")

### 3. Teaken

Carter asserts Officer/Agent Teaken was "removed from [his] investigation" and that Nance "entered into a stipulation agreement to not call the agent, against [Carter's] very adament [sic] wishes." (Dkt. No. 1 at 7.) The Government avers that it has no knowledge of who Officer Teaken is, and Carter sheds no light on Teaken's identity or role. Carter also makes no showing about what Teaken's testimony would have been—let alone that it would have been favorable to the defense. Carter has not and cannot demonstrate that he suffered prejudice from this decision. See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000); U.S. v. Berry, 814 F.2d 1406,1409 (9th Cir. 1987).

### 4. Assistance of Counsel on Appeal

Carter asserts that Jay Nelson, his appellate counsel, was ineffective because he did not raise an argument about exculpatory evidence and discredit Agent Penn's statements until the reply brief. (Dkt. No. 1 at 6.) The Court liberally construes the petition to assert that Nelson improperly based the Brady and Napue arguments solely on the May 18th, 2011 Coleman call

and the email exchange between the Coleman prosecutor and Agent Penn and failed to support the argument by citing to additional Coleman calls, as Carter asked.

But as the Government notes, only Coleman's May 18th call was part of the record, and briefing the additional calls on appeal was prohibited except under very limited circumstances by Federal Rule of Appellate Procedure 10. When the defense did try to supplement the record to include these calls in connection with their reply brief, the Ninth Circuit denied that motion. Brown, Case No. 16-30297, Dkt. Nos. 63, 83. Further, Carter does not explain why additional Coleman calls, even if they contained grave threats, would have been relevant to his duress defense when the Ninth Circuit found that the "decision to smuggle cocaine for the U.N. Gang would have done nothing to allay Coleman's ire toward Brown," and there was therefore no "'reasonable probability' that the jury would have acted differently had they learned of the Coleman materials at trial." See Brown, 754 F. App'x at 582 (citing Strickler, 527 U.S. at 281). For these reasons, Carter cannot demonstrate prejudice from Nelson's decision not to rely on these calls when crafting the opening brief.

### F. Prosecutorial Misconduct

Carter argues the prosecutors engaged in misconduct by "claim[ing] that the Coleman F.D.C. recordings did not exist even after they were retrieved from F.D.C. and turned over to the defense via 'data dump.'" (Dkt. No. 1 at 8.) The Court construes this as a claim that the prosecutor violated his Brady and Due Process rights. This argument was rejected by the Ninth Circuit on the grounds that this evidence was not material to Carter's duress defense, and thus no Brady violation had occurred. See Brown, 754 F. App'x at 582. The Court will not reconsider this argument.

The Court also construes this as a claim that the prosecutors engaged in misconduct by making false statements to the Court about discovery related to the Coleman calls. The Court rejects this argument. Because Carter did not raise this argument before the Court entered the judgment of conviction or during his direct appeal, he has procedurally defaulted. United States v. Mejia-Mesa, 153 F.3d 925, 929 (9th Cir. 1998); Bousley v. United States, 523 U.S. 614, 622 (1998). To overcome this procedural default, Carter must "show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982). Carter has not made either showing and the Court rejects this claim.

**G.      Evidentiary Hearing and Certificate of Appealability**

Carter also requests an evidentiary hearing. The Court finds that an evidentiary hearing is not warranted, as "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). For the same reason, the Court declines to issue a certificate of appealability. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (petitioner seeking a certificate of appealability must demonstrate "a substantial showing of the denial of a constitutional right.").

**CONCLUSION**

Though the Court accepts Carter's otherwise untimely petition under the doctrine of equitable tolling, the Court finds no grounds on which to grant the relief sought. The Court finds no grounds on which to appoint counsel, hold an evidentiary hearing or issue a certificate of appealability. The Court DENIES the petition for habeas corpus.

\\

\\

The clerk is ordered to provide copies of this order to Carter and to all counsel.

Dated May 18, 2021.

*Marsha J. Pechman*

Marsha J. Pechman
United States Senior District Judge